Theodore Pockrandt v. Commissioner.
Pockrandt v. Commissioner
Docket No. 87643.
United States Tax Court
T.C. Memo 1962-260; 1962 Tax Ct. Memo LEXIS 47; 21 T.C.M. (CCH) 1403; T.C.M. (RIA) 62260; November 6, 1962
John M. Hanley, Esq., 110 E. Wisconsin Ave., Milwaukee, Wis., for the petitioner. Vernon R. Balmes, Esq., for the respondent. DAWSON
Memorandum Findings of Fact and Opinion DAWSON, Judge: The respondent determined deficiencies in the petitioner's income tax for the years ended December 31, 1957, and December 31, 1958, in the respective amounts of $371 and $453. The only issue for decision is whether amounts received by the petitioner pursuant to a contract for the removal of limestone, rock, sand and gravel from his property constitute ordinary income or proceeds from the sale of a capital asset. Findings of Fact All of the facts are stipulated and are so found. Theodore Pockrandt, hereinafter referred to as petitioner, was a resident of Westfield, Wisconsin, during the years 1957 and 1958. Petitioner *48 filed Federal income tax returns for the years 1957 and 1958 on or before April 15, 1958, and April 15, 1959, respectively, with the district director of internal revenue, Milwaukee, Wisconsin. On December 7, 1956, petitioner and his wife, Helen Pockrandt, entered into a contract with Edward Kraemer, Rudolph Kraemer, Fred Kraemer and Victor Kraemer, d/b/a Edward Kraemer and Sons, hereinafter referred to as contractor. The pertinent provisions of such contract are as follows: THIS LEASE AND AGREEMENT, made this 7th day of December 1956, by and between Theodore Pockrandt & Helen Pockrandt of Westfield, Wisconsin, party of the first part, and Edward Kraemer and Sons, Contractors of Plain, Wisconsin, parties of the second part. WITNESSETH THAT WHEREAS: The party of the first part for and in consideration of the sum of One hundred dollars ($100.00) and of the covenants hereinafter contained has leased unto the parties of the second part, their heirs or assigns, for the purpose of exploration and development of mining, quarrying, excavating and removing limestone, rock, sand and gravel from these premises on that certain tract of land situated in Springfield Township, Marquette County, *49 in the State of Wisconsin, containing 80 acres, more or less, described as follows: The South East one quarter (SE 1/4) of the South West one quarter (SW 1/4) and, the South West one quarter (SW 1/4) of the South West one quarter (SW 1/4) and, the North East 1/4 of the South West quarter all in Section 3, Town 17 North, Range 8 East. It is hereby understood and agreed, that for the consideration of $100.00 herein provided, the parties of the second part shall have the right to develop and operate a quarry where they deem it most desirable to do so on the above described premises, to place quarry strippings where convenient adjacent to the quarry site, to remove trees if it is deemed necessary, and to build and maintain a road or roads where necessary from the quarry site to the highway. It is further agreed, that the parties of the second part shall be responsible for damages, to the buildings on the premises, which may be caused through blasting operations. It is further understood and agreed, that should the parties of the second part fail to operate the quarry on the above described premises at sufficient intervalls [intervals] to supply the demand, either through annual *50 operations or from stock piles produced for such purpose, the parties of the first part may, after sufficient proof of such failure and one year after written notice to such effect, terminate this lease if they so desire. By these presents, and for the duration of this lease, the party of the first part grants an easement to the party of the second part over the lands above described permitting said second party to establish and maintain an access road for the purpose of ingress and egress to quarries located thereon or adjacent thereto. It is further agreed that at no additional expense the party of the second part shall be privileged to dump the overburden stripped from quarries located on these premises wherever it is most economical so to do. Unless otherwise expressly provided for herein this will be on land adjacent to the quarries. TO HAVE AND TO HOLD, said premises above described unto the said parties of the second part, their heirs and assigns, for the term of twenty-five (25) years from and after the date hereof. This instrument shall be in full force and effect for a like term in addition to that herein provided, unless either party shall at least thirty days before *51 the expiration date, serve notice on the other in writing of his intention to terminate this lease on December 7, 1981. As a further consideration, parties of the second part agree to keep accurate records of the total cubic yards of rock, sand and gravel and/or the total tons of limestone severed from the soil and on the basis of said records agree to pay party of the first part the sum of five cents (5") per cubic yard for all sand, gravel or rock and/or five cents (5") per ton for all agricultural limestone quarried from the premises. Title to such mineral is vested in second parties. All the terms and conditions of this lease and agreement shall be binding upon the heirs, legal representatives or assigns of the parties hereto. Should Third Parties acquire an interest herein it shall be incumbent upon the Party acquiring such interest to immediately notify the other (Partys) hereto in writing concerning the facts relative thereto. On the back of the printed agreement there was a form entitled "Record of Quarry Operations and Royalty Payments." There were, however, no entries on such form. During the years 1956, 1957 and 1958, the petitioner held title to the 80 acres of *52 real property, described in the contract dated December 7, 1956, under a deed from Gustav Pockrandt and Emilie Pockrandt, dated November 15, 1919. The amounts of $6,208.50 and $5,801 were received by the petitioner during the years 1957 and 1958, respectively, from Edward Kraemer and Sons pursuant to the contract for the removal of limestone, rock, sand and gravel from the 80 acres of land owned by the petitioner. Petitioner reported the $6,208.50, received during the year 1957 as ordinary income and claimed percentage depletion of 33 1/3 percent, or $2,069.50, on his income tax return filed for the year 1957. On February 11, 1959, the petitioner filed a document entitled "Amended Return for 1957" with the district director of internal revenue, Milwaukee, Wisconsin, in which he claimed that the $6,208.50 was taxable as a long-term capital gain. He alleges in his petition that the capital gains treatment results in an overpayment of $184 in taxes for the year 1957. Petitioner reported the $5,801 received pursuant to the contract during the year 1958 as a long-term capital gain in his income tax return for that year. In the statutory notice of deficiency, respondent disallowed *53 depreciation deductions in the years 1957 and 1958 in the respective amounts of $200 and $200. These adjustments were not contested in the petition. Respondent determined that the amounts received by the petitioner in 1957 pursuant to the mineral contract with Edward Kraemer and Sons constituted royalties and were therefore taxable as ordinary income. Respondent further determined that the allowable depletion deduction for 1957 amounted to $310.43 in lieu of the $2,069.50 claimed by the petitioner in his original return for 1957. This decrease in allowable depletion was not contested in the petition. In the statutory notice of deficiency, the respondent further determined that the amounts received by the petitioner in 1958 for the removal of limestone, rock, sand and gravel from his property constituted ordinary income in the form of royalties. The allowance for depletion on such amounts was computed at 5 percent, or $290.05. In his petition, the petitioner has alleged that the respondent erred only in his determination that the sale of minerals in question did not qualify for treatment as a long-term gain on the sale of a capital asset. Consequently, the sole issue remaining *54 is whether the amounts received by the petitioner in 1957 and 1958 constitute ordinary income or capital gains. Opinion The question here involved has been the subject of much litigation and the results do not appear to be consistent in every case. As noted in the case of , however, these conflicts can be attributed to mere differences in views with respect to comparatively similar factual situations in attempting to apply the same general principles. In determining whether the proceeds of a given mineral transaction constitute ordinary income or capital gain we must look to the so-called "economic interest" test. The established rule is that where the owner of the land retains an economic interest in the deposits, the transaction is regarded as a lease and the proceeds are taxable as ordinary income, subject, under certain conditions, to a deduction for depletion. Conversely, where the owner does not retain an economic interest, the transaction is regarded as a sale and, assuming that the transaction otherwise qualifies for capital gains treatment, the proceeds are taxable as capital gain. Thus, the question to be determined in *55 every case is whether there has been a sale of the natural deposit "in place." Looking at the facts before us, did the agreement entered into by the parties effect a sale of the materials "in place"? We consider first the language adopted by the parties in the agreement. The document is entitled "Lease and Agreement" and the term "this lease" is referred to numerous times throughout the instrument. The following provision setting forth the purpose of the contract is highly significant: The party of the first part * * * has leased unto the parties of the second part, their heirs and assigns, for the purpose of exploration and development of mining, quarrying, excavating and removing limestone, rock, sand and gravel from these premises * * *. A provision of this nature is certainly a lease provision, typical of most mineral leases. Respondent urges that the agreement is clearly a lease and that it accurately reflects the intention of the parties and the true substance of the transaction entered into between them. The petitioner, on the other hand, points out provisions of the contract which he contends indicate that a sale was intended. Petitioner relies heavily on the provision *56 that "Title to such mineral is vested in second parties." It is abundantly clear, however, that "such mineral" does not refer to all the natural deposit in place but rather to that material actually quarried from the premises. The statement appears in the paragraph of the agreement pertaining to the keeping of records of the total cubic yards of rock, sand and gravel and the total tons of limestone actually severed from the soil. Petitioner further asserts that the proceeds were not in the form of royalties since he was to receive a fixed price per unit removed without reference to the prices received or the profits, if any, made by the purchaser. In , this Court was confronted with the problem of construing mineral agreements containing provisions similar to those relied on by the petitioner. Those contracts contained the following provision: The consideration to be paid to the Owners by the Contractor for the right to remove the soil and/or sub-soil hereinabove mentioned from the property of the Owners shall be ten cents per cubic yard of soil and/or sub-soil removed, said soil to become property of the Contractor. On the facts in that case, *57 we held that the contracts merely established the terms and conditions upon which the taxpayers undertook to sell dirt as the contractors removed it from the taxpayer's land and that the contracts themselves did not effect any such sale. A substantially similar provision appeared in the mineral agreement under question in (C.A. 3, 1962), affirming a Memorandum Opinion of this Court. There the Court held that the transaction between the taxpayers and the contractors was simply an arrangement whereby the contractor was granted the right to excavate and remove earth fill in return for a royalty of a specified sum per unit of material taken and not a sale within the meaning of the capital gains provisions. The agreement in this case, unlike the agreements in the Green and Laudenslager cases, does not provide for the removal of any minimum or specified amount of material. In fact, the contract here does not obligate the contractor to remove any material from the petitioner's land. Petitioner's only method of enforcing the contract is to use his right to terminate it on one year's notice if he determines that the contractor *58 is not operating the quarry at sufficient intervals to supply the demand, in which case the contractor will lose no more than the stated consideration of the contract ($100.00). On these facts, we distinguish , relied on by the petitioner, where the parties contemplated that all the material on the taxpayer's property would be removed with no right of termination. Although the agreement in the Laudenslager case called for a minimum of 400,000 cubic yards of earth fill to be removed from the taxpayer's premises, both this Court and the Third Circuit found that this was not an absolute minimum and held that the contract did not effect a sale. Likewise, we held that no sale occurred in the Green case, even though the agreements provided for the right to remove approximately 400,000 cubic yards of soil in one contract and approximately 100,000 cubic yards in the other. A fortiori, no sale of the minerals in place is indicated by the agreement here in question which does not provide for the extraction of any minimum or specified amount. Construing the instrument as a whole and considering it against the subject matter and surrounding circumstances, *59 we hold that the contract was not one of sale of the natural deposits in place. Title to the quarried material was vested in the contractor. Accordingly, until the materials were quarried, they remained the property of the petitioner and the profits realized therefrom must be treated as ordinary income. For the reasons stated, Decision will be entered for the respondent.